UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                            )
RAFAEL SANCHEZ,             )
            Plaintiff,      )
                            )
        v.                  )        CIVIL ACTION
                            )        NO. 14-12317-WGY
CAROLYN W. COLVIN,          )
Acting Commissioner, Social )
Security Administration,    )
                            )
            Defendant.      )
_____ )
```

YOUNG, D.J.                            September 28, 2015

MEMORANDUM & ORDER

**I.   INTRODUCTION**

This action is brought under sections 205(g) and 1631(c)(3)

of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3).

Compl. ¶ 1, ECF No. 1.  The Plaintiff, Rafael Sanchez

("Sanchez") seeks review of the final decision of the

Commissioner of the Social Security Administration, denying

Supplemental Security Income ("SSI") benefits.  Compl. ¶¶ 1, 11-

15.  Specifically, Sanchez claims that the Administrative Law

Judge (the "hearing officer") did not give proper weight to the

testimony of Sanchez's treating physician and psychiatrist, that

he did not base his determination of Sanchez's credibility on

substantial evidence, and that he improperly relied on the

testimony of the vocational expert.  Pl.'s Mem. Supp. Mot. J.

Pleadings ("Pl.'s Mem.") 11, 17, 19, ECF No. 15.   Thus, Sanchez

contends, the Commissioner's decision was "contrary to law," and

Sanchez asks this Court to either reverse the Commissioner's

decision and grant SSDI benefits, or alternatively, remand the

case for further proceedings.   Compl. ¶ 15.   The Commissioner,

conversely, asks this Court to affirm her decision.   Mem. Supp.

Def.'s Mot. Affirm Comm'r's Decision ("Def.'s Mem.") 20, ECF No.

21.

### A.   Procedural Posture

On August 25, 2010, Sanchez applied for SSI benefits.

Administrative Record ("Admin. R.") 274, ECF No. 11.   His

application was initially denied, so Sanchez requested a hearing

before a hearing officer.   Id. at 239.   On March 7, 2013, a

hearing was held, and on March 29, the hearing officer found

that Sanchez was not disabled, and again denied his request for

SSI benefits.   Id. at 78.   Sanchez then filed a request for an

appeal.   On March 15, 2014, the request was denied.   Id. at 1.

The Appeals Council allowed Sanchez additional time to file a

civil suit, and on May 29, 2014, he filed this action.   Compl. ¶

12.

**B.   Factual Background**

Sanchez was forty-eight years old at the onset of his alleged disability, and had previously worked as a groundskeeper and tire changer.  Admin. R. 107.  He alleges disability as of September 1993, and claims he has been unable to engage in substantial gainful employment from that time through the present.  Compl. ¶¶ 4-5.

**1.   Treatment at the North Shore Medical Center**

Sanchez initially sought treatment for his conditions in August 2010, at the North Shore Medical Center.  On August 17, 2010, Sanchez saw Dr. William Whitfield ("Dr. Whitfield") for follow up treatment for his previously-diagnosed hepatitis C.  Admin. R. 424.  He had commenced treatment with PEG Interferon and Ribavirin, and was complaining of "generalized weakness" and "intermittent episodes of right upper quadrant . . . discomfort."  Id.  Sanchez's medical records recounted his history of medical problems, including substance abuse, hypertension, lower back pain, and shoulder pain for which surgery was recommended.  Id.  After a physical examination and blood work, Dr. Whitfield diagnosed Sanchez with hepatitis C, and right upper quadrant pain.  Id. at 429.

On September 8, 2010, Sanchez returned to the North Shore Medical Center and was seen by Dr. James Gottschall ("Dr. Gottschall"); Sanchez complained of ongoing abdominal pain,

fatigue, and wheezing.  Id. at 474.  Dr. Gottschall echoed the
previous diagnosis, and noted that Sanchez's symptoms "could be"
the result of his hepatitis C treatment.  Id. at 477.

On December 1, 2010, Sanchez was seen again by Dr.
Whitfield, after complaining of fatigue and widespread pain.
Id. at 552.  Dr. Whitfield requested blood work, id., but
Sanchez apparently never followed through with the suggested
appointment, id. at 553.  On March 31, 2011, Dr. Whitfield
stated in a questionnaire that Sanchez's hepatitis C was in
remission, and that his prognosis was good as long as he
refrained from drug and alcohol use.  Id. at 556.  On June 20,
2011, Dr. Whitfield noted that Sanchez had completed his
treatment with Interferon, and suggested that he stop taking
Ribavirin, as it was causing abdominal pain and fatigue.  Id. at
716-17.  At this same appointment, Dr. Whitfield noted that
Sanchez had still not completed his blood work, and that he did
not provide a satisfactory explanation for his failure to have
done so.  Id. at 716.  Dr. Whitfield did observe, however, that
Sanchez's hepatitis C remained under control.  Id. at 716-17.

On September 13, 2011, Sanchez underwent an MRI, which
showed "mild degenerative change at L5-S1, [which had remained]
unchanged since [November 2010]. . . . [and] moderate
degenerative changes in the left glenohumeral joint and a
chronic fracture deformity of the mid clavicle."  Id. at 706-07.

Sanchez returned to Dr. Whitfield on October 13, 2011, complaining of occasional abdominal pain and tiredness, along with back pain, and during the physical examination Sanchez guarded his abdomen.  Id. at 718.  Dr. Whitfield also noted at this appointment that Sanchez still had not gotten his blood work done.  Id.

Sanchez finally completed his blood work in May 2012, which revealed that his hepatitis C had been successfully treated: he did not "have any significant viral load."  Id. at 720-21.  In June of 2012, Sanchez admitted that he had been using heroin, and that his request to increase his methadone dosage was denied.  Id. at 720.  He complained of abdominal pain and continued lower back pain, so Dr. Whitfield ordered an MRI, which revealed gallstones, but showed that his liver was functioning normally.  Id. at 710.

On February 13, 2013, Dr. Gottschall filled out a Multiple Impairment Questionnaire, in which he indicated that he saw Sanchez for treatment two to four times a year for his degenerative arthritis in his left shoulder and lumbar spine. Id. at 698.  He also noted that surgery had been previously recommended for Sanchez's shoulder impairment, id., and that the injury restricted Sanchez's range of motion in his shoulder, id., and caused lower back pain, id. at 699.  Dr. Gottschall further stated that Sanchez suffered from "moderate degenerative

5

changes of the gleno-humeral joint and spurring of [the]
inferior glenoid process[,]" as well as degeneration of the
lumbar spine.  Id.  These conditions, according to Dr.
Gottschall, caused Sanchez moderate pain in his shoulder and
lower back, as well as a restricted range of motion in his left
shoulder, and inhibited him from lifting heavy objects.  Id. at
700-701.  Dr. Gottschall also rated Sanchez's complaint of
fatigue as severe.  Id. at 700.

Given his symptoms and conditions, Dr. Gottschall opined
that Sanchez could sit for four hours and stand for two during
an eight-hour workday, but that he would need to take a break
after every thirty to sixty minutes of sitting.  Id.  In Dr.
Gottschall's opinion, Sanchez should lift no more than five
pounds, and even that only occasionally, and he had "[m]arked"
limitation in his use of his left arm for reaching and grasping,
and he was "moderate[ly]" limited from using the left upper
extremity for "fine manipulations."  Id. 701-702.  Finally, Dr.
Gottschall stated that Sanchez's pain and fatigue were
sufficiently severe as to interfere with his ability to
concentrate, and indicated that Sanchez was not a "malingerer."
Id. at 703.

On March 8, 2013, Dr. Gottschall completed a Medical Report
for the Massachusetts Department of Transitional Assistance, in
which he reasserted Sanchez's previously-discussed conditions,

and further opined that the impairments interfered with his
ability to complete household tasks, manage his medications, and
use a computer.  Id. at 778.  According to Dr. Gottschall, the
condition would likely last between six to twelve months.  Id.
at 779.

### 2.   Treatment at Elliot Community Human Services, Inc.

Sanchez began receiving treatment at Elliot Community Human
Services on February 28, 2012.  Id. at 570.  At his intake
evaluation, Sanchez stated that he was suffering from depression
and anxiety that interfered with his ongoing treatment for
heroin addiction, which he was treating with methadone.  Id. at
617.  A mental examination checklist indicated that Sanchez
exhibited soft speech, an emotional state that was both anxious
and depressed, slowed body movements, an affect that was flat,
and current visual hallucinations along with a history of
auditory ones, an impaired (but not severely impaired) ability
to make reasonable decisions, and "minimal" impulse control.
Id. at 619.  Sanchez was diagnosed with major depressive
disorder, opioid addiction, "panic with agoraphobia," and
schizoaffective disorder, with a Global Assessment of
Functioning ("GAF") score of 42.[1]  Id. at 620.  Upon a

---

[1] The Global Assessment of Functioning ("GAF") scale "rates
overall psychological functioning on a scale of 0–100 that takes
into account psychological, social, and occupational

psychiatric evaluation on March 14, 2012, Sanchez was further diagnosed with major depressive disorder and a panic disorder, and was prescribed Seroquel and Celexa. Id. at 595.

On May 21, 2012, Robert Childers ("Childers"), a licensed social worker, evaluated Sanchez and noted "sever[e] depression and anxiety symptoms[,]" including "difficulty concentrating, . . . insomnia, . . . [occasionally] feel[ing] suicidal, [and] . . . . shortness of breath. Id. at 599. Childers diagnosed Sanchez with major depression, generalized anxiety disorder, and opioid dependence, with a GAF score of 45. Id. at 609.

In June 2012, Dr. German Crisostomo ("Dr. Crisostomo") began treating Sanchez. Id. at 590-92. On June 25, 2012, Sanchez complained of feeling stressed and sad, as well as of visual hallucinations of animals, inability to sleep, decreased energy, concentration, and memory, and disorientation as to the day of the month. Id. at 575. Dr. Crisostomo diagnosed Sanchez with opiate dependence in "full early remission," and major depressive disorder, among other things, and estimated a GAF

---

functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 34 (4th ed. rev. 2000)). "A GAF [score] in the range of 41 to 50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" Id. at 406 n.2 (quoting DSM-IV 34).

score of 60.[2]  Id. at 575-76.   Dr. Crisostomo saw Sanchez monthly
from June 2012 until February 2013, when Dr. Crisostomo filled
out a Psychiatric/Psychological Impairment Questionnaire.   Id.
at 628-635.

   On this document, Dr. Crisostomo noted Sanchez's diagnosis
of depression, social anxiety, panic disorder, and opioid
dependence.   Id. at 628.   He further noted that Sanchez's GAF
score was 60, and that his "primary symptoms" were "poor
concentration," "anxiety," and "panic attacks."   Id. at 628,
630.   In Dr. Crisostomo's opinion, Sanchez was "[m]arkedly
limited" in his "ability to remember locations and work-like
procedures," and "detailed instructions," as well as in his
capacity to concentrate for extended periods of time, to
maintain a schedule, and to interact with co-workers or adhere
to socially appropriate behavior.   Id. at 630-33.   Sanchez was
also "moderately limited" in his capacity to remember and
execute one- or two-step instructions.   Id.   According to Dr.
Crisostomo, Sanchez's symptoms and conditions caused him to
"experience episodes or deterioration . . . in work or work[-

---

   [2] A GAF score "in the range of 51 to 60 indicates 'moderate
symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)."   Zabala, 595 F.3d at 406
(quoting DSM-IV 34).

]like settings which cause him[] to withdraw from that situation and/or experience an exacerbation of signs [and] symptoms[,]" and that because of this, Sanchez could not endure "even low stress." Id. at 633, 634.  In his opinion, Sanchez was not a malingerer, but his physical conditions were exacerbated by his mental maladies.  Id. at 634-35.  On March 5, 2013, Childers stated that Sanchez's disabilities existed even though he was no longer using drugs or alcohol, and that his use of drugs and alcohol was a symptom of his disability and a form of self-medication, rather than the cause of his disability.  Id. at 739.

According to Sanchez, because of his back and shoulder problems, along with his anxiety, he cannot work.  Id. at 118. He states that his heart races, his palms become sweaty, and he gets "choked up" when he tries to talk to people.  Id.  When he is going through a depressive episode, he sometimes cannot get out of bed for "weeks," and experiences hallucinations "[j]ust about every day."  Id. at 135.  Furthermore, because of his back and shoulder pain, he has a difficult time reaching with his left side, and he occasionally has difficulty moving.  Id. at 119-20.  Sanchez is largely cared for by his roommate, Mary Kalipinski, who manages his medications, id. at 121, and does

the grocery shopping and household chores,[3] _id._ at 130.  While he

can "boil an egg," Sanchez does not prepare any meals for

himself.[4]  _Id._ at 131.  His day typically consists of driving his

roommate to work, going to the Methadone clinic, and watching

TV.  _Id._ at 129-30.

## II.  LEGAL STANDARD

### A.    Standard of Review

Although this Court can "affirm, modify, or reverse a

decision of the Commissioner[,] . . . . the findings of the

Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive."  _Rivera_ v. _Astrue_,

814 F. Supp. 2d 30, 33 (D. Mass. 2011) (citing 42 U.S.C. §

405(g)) (additional internal citation omitted).  "As it is the

role of the Commissioner to draw factual inferences, make

credibility determinations, and resolve conflicts in the

evidence, the Court must not perform such tasks in reviewing the

record."  _Rivera_, 814 F. Supp. 2d at 33 (citing _Irlanda Ortiz_ v.

_Sec'y of Health & Human Servs._, 955 F.2d 765, 769 (1st Cir.

1991)).  Thus, the Commissioner's findings and decisions must be

---

[3] Sanchez previously stated that he was able to take out the
trash and do his own laundry, and do the grocery shopping and
pay bills.  _Id._ at 343-44.   At trial, however, he testified to
the contrary.  _Id._ at 131-32.

[4] Sanchez had previously stated that he cooked his own
meals, Admin. R. 343, but he later testified that he did not,
_id._ at 131.

upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation omitted). While this Court can alter a decision of the Commissioner, it is only empowered to do so if "[she] has committed a legal or factual error in evaluating a certain claim." Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)). This means that as long as the record arguably supports the Commissioner's decision, even if another outcome is equally plausible, the Commissioner's determination must stand "so long as it is supported by substantial evidence." Rivera, 814 F. Supp. 2d at 33 (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)). Thus, this Court can reverse a decision only if it was "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Bazile v. Apfel, 113 F. Supp. 2d 181, 184 (D. Mass. 2000) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)).

B.    **Social Security Disability Standard**

A disabled person is someone who is unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505.  The Social Security Administration employs a five-step process to determine whether a person is disabled. See id. § 404.1520(a)(1).  First, the hearing officer asks whether the claimant is currently performing "substantial gainful activity," meaning work that is both substantial and gainful.  Id. § 404.1520(a)(4)(i).  Substantial work "involves doing significant physical or mental activities[,]" id. § 404.1572(a), while gainful work is any work "usually done for pay or profit, whether or a not profit is realized[,]" id. § 404.1572(b).  If the claimant is found to be performing substantial gainful activity, she is not disabled.  Id. § 404.1520(a)(4)(i).  If the claimant is not currently engaged in substantial gainful activity, the inquiry moves to the second step, which asks whether the claimant's impairment, or combination of impairments, is severe.  Id. § 404.1520(c).  A severe impairment is one that "significantly limits [an individual claimant's] physical or mental capacity to perform basic work-related functions."  Goodermote v. Sec'y of Health &

Human Servs., 690 F.2d 5, 6 (1st Cir. 1982) (internal quotation marks omitted).  If the claimant's impairment does not rise to the level of severe, he is not considered disabled and the inquiry ends.  See id.

If the hearing officer deems the impairment severe he then undertakes the third step of the analysis, where he determines if the severity of the impairment is such that it is "equivalent to a specific list of impairments contained in the regulations." Id.  "If the claimant has an impairment of so serious a degree of severity [as the listed ones], the claimant is automatically found disabled."  Id.  If not, then the hearing officer moves on to the fourth step.  The fourth step involves two sub-parts. First, the claimant's residual functional capacity is determined.  20 C.F.R. § 404.1520(e).  The residual functional capacity is the claimant's ability to perform work activities despite his impairments, including impairments that were not deemed severe.  Id.  Second, the hearing officer decides whether the claimant has the residual function capacity to do his past relevant work, id., meaning work that he has performed within the last fifteen years that lasted long enough to be substantial gainful activity.  Id. § 404.1560(b)(1).  If the claimant can perform his past relevant work, he is not disabled.  See Goodermote, 690 F.2d at 7.  If he cannot perform any past relevant work, the inquiry proceeds to the fifth and final step,

14

at which point the burden then shifts to the Social Security
Administration to show that given the claimant's age, education,
and prior work experience, combined with his impairment(s),
"there are other jobs in the economy that claimant can
nonetheless perform."  Id.  If the Social Security
Administration cannot show that the claimant is able to perform
any other work, he will be deemed disabled.  See id.

## III. THE HEARING OFFICER'S DECISION

On March 29, 2013, the hearing officer, after a hearing,
denied Sanchez's request for SSI benefits.  Admin. R. 38.
Applying the five-step analysis, the hearing officer first found
that Sanchez had not engaged in substantial gainful activity
since August 25, 2010, the date of his application.  Id. at 44.
Next, he found that Sanchez had "the following severe
impairments: lumbar spine degenerative changes, left shoulder
arthritis, asthma, hepatitis C, depressive and anxiety
disorders, personality disorder, and substance abuse."  Id.
(citation omitted).  The hearing officer found these ailments
"'severe' because they have more than a minimal impact upon
[Sanchez's] physical and mental abilities to do basic work
activities[.]"  Id.  Though Sanchez's impairments were severe,
the hearing officer determined that they did not rise to the
level of one of the listed impairments in the Code of Federal
Regulations.  Id.  Thus, the inquiry proceeded to step four.

At step four, the hearing officer considered the record and found that Sanchez had

> the residual functional capacity to perform medium work . . . except he also: is limited to no more than occasional pushing, pulling, and overhead reaching with the left upper extremity . . . [and] must avoid concentrated exposure to temperature extremes, humidity, and pulmonary irritants; can understand and carry out [two- to three-]step tasks and maintain concentration, persistence, and pace for [two]-hour increments over an eight hour workday[;] . . . and is limited to superficial social interaction.

Id. at 45. He came to this conclusion by following a two-step inquiry. Id. at 46. First, he considered Sanchez's symptoms to determine whether "there [was] an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce [his] pain or other symptoms." Id. Second, he assessed "the intensity, persistence, and limiting effects of [Sanchez's] symptoms to determine the extent to which they limit [his] functioning." Id. At this step, if there is any inconsistency, or the claimant's statements are not supported by objective medical evidence, then the hearing officer must make a credibility determination based on the record in its entirety. Id. Here, the hearing officer found that Sanchez's medically determinable ailments could reasonably be expected to cause his alleged symptoms of back and shoulder pain, difficulty breathing, stomach and liver pain, and depression and anxiety. Id. At the next step, however, the

16

hearing officer stated that Sanchez's statements about his symptoms' effects on his ability to function were "not entirely credible," as they conflicted with objective medical evidence in the record, as well as with Sanchez's own testimony regarding his activities and capabilities.   Id.

Though Sanchez complained of pain resulting from his lumbar spine degeneration and shoulder arthritis, medical evidence in the record indicates that these were only mild ailments, and his doctors "repeatedly observed intact strength, sensation, and gait, including as of 2013." Id. (citations omitted). Furthermore, while Sanchez has been diagnosed with asthma, which caused occasional wheezing, his medical records show that this condition is well-managed with medications, and does not "show any complications such as emergency medical treatment." Id. (citations omitted).  Moreover, the hearing officer noted that he took into account Sanchez's complained-of asthma when he stated that he had to avoid exposure to irritants.   Id.

Similarly, though Sanchez suffers from hepatitis C, and related abdominal pain and generalized weakness, his medical records show that the condition is stable and under control. Id. at 47.  In addition to conflicting with objective medical evidence, the hearing officer found that Sanchez's alleged symptoms and their limiting effects were not consistent with his statements regarding his daily activities and abilities.   Id.

For example, while Sanchez avers that he suffers from back and shoulder pain, as well as wheezing and fatigue that render him unable to function, he reported that he was able to perform household chores and shopping (which he later denied at the hearing), that he sold and ran drugs, sold scrap metal, and worked on and rode motorcycles.  Id.  These activities, the hearing officer stated, combined with repeated objective findings that his back and shoulder conditions were normal, show that Sanchez's "extent of pain and symptoms is not to the totally disabling level as he alleges[.]"  Id.  Similarly, though Sanchez's treating physician, Dr. Gottschall, opined that he was completely unable to work, the hearing officer gave this opinion little weight, as it conflicted with the objective medical evidence, as well as Sanchez's testimony regarding his aforementioned activities.  Id.

Regarding Sanchez's mental health impairments, the hearing officer again found that Sanchez suffered from legitimate medical conditions that could reasonably cause his symptoms, but that his statements regarding their effects were not credible. Id. at 48-49.  He first noted that Sanchez's ongoing substance abuse decreased his credibility, especially given his inconsistent and conflicting statements about it.  Id. at 49. The hearing officer then stated that while it was evident that Sanchez suffered from "depressive and anxiety symptoms," they

18

were not as disabling as he claimed.  Id.  Sanchez's GAF score
of 60, which, as the hearing officer observed, is in the upper
range indicating moderate symptoms, directly conflicts with
Sanchez's claim of total impairment.  Id.  Furthermore, his
ability to do housework, shop, drive, sell and run drugs, sell
scrap metal, maintain a romantic relationship, and fix and ride
motorcycles, show "no more than mild restriction because of
mental symptoms," though his medical records indicate occasional
decreased energy.  Id.

   In reaching this conclusion, the hearing officer relied on
the opinion testimony of the impartial medical expert, Dr. Susan
Witke ("Witke"), who "noted many inconsistencies in the record,
such as that [Sanchez] alleges totally disabling symptoms and
had low scores on cognitive testing at all times, but there is
also evidence of substance abuse and that claimant was
performing activities such as selling scrap metal, which
suggests a higher level of functioning."  Id.  This opinion was
supported by Sanchez's GAF scores and his own testimony
regarding his activities.  Id.  Witke also opined that Sanchez's
extended depressive episodes of one to two weeks were the result
of substance abuse.  Id.  The hearing officer found this opinion
supported by the absence in Sanchez's medical records of "any
inpatient psychiatric hospitalizations, let alone of extended
duration."  Id.  The hearing officer gave the opinion of

Sanchez's treating psychiatrist little weight because the psychiatrist's opinion that Sanchez was severely impaired in his ability to function socially and maintain concentration was not supported by the record, especially given Sanchez's high GAF scores, his "concurrent issues [with not exerting sufficient] effort during testing[, his] substance abuse[,]" and his reported activities.  Id. at 50-51.

The hearing officer next found that Sanchez was unable to perform his past relevant work.  Id. at 50.  So, he proceeded to step five, whereby he determined that given Sanchez's residual functional capacity, he could work as a dining room attendant, a hand launderer, a kitchen helper, or a marker.  Id. at 51.  At this stage, the hearing officer relied on the testimony of the impartial vocational expert, who opined that even with his limitations, Sanchez could perform the aforementioned occupations.  Id.  Thus, the hearing officer found that Sanchez was not disabled as defined by the Social Security Act, and denied his request for benefits.  Id. at 51-52.

## IV.  ANALYSIS

### A.  Sanchez's Argument

Sanchez contests the hearing officer's decision on three grounds.  First, he claims that the hearing officer did not give proper weight to the opinions of his treating physicians.  Pl.'s Mem. at 11.  Specifically, Sanchez asserts that their opinions

were at least entitled to some deference, there is no
conflicting evidence in the record, and the hearing officer did
not weigh the opinions of the treating physicians in accordance
with all of the factors listed in 20 Code of Federal Regulations
sections 927(c)(2) and 1527(c).  Id. at 11-13 (citations
omitted).  Next, Sanchez contends that the hearing officer did
not properly determine Sanchez's credibility with respect to the
severity of his symptoms, as the credibility determination is
not supported by substantial evidence.  Id. at 17-18.  Finally,
Sanchez argues that the testimony of the vocational expert, to
the effect that Sanchez could work as a dining room attendant,
hand launderer, kitchen helper, or marker, "directly conflicts
with the Dictionary of Occupational Titles ('DOT')," which
indicates that these jobs require reaching.  Id. at 19.

> **1.   The Hearing Officer Properly Weighed the Opinion
>        Evidence.**

The medical opinion of a treating physician must be given
controlling weight if it is "well-supported and 'not
inconsistent' with the other substantial evidence in the case
record."  SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996); see
also 20 C.F.R. § 404.1527(c)(2).  To be inconsistent, evidence
only need "be such relevant evidence as a reasonable mind would
accept as adequate to support a conclusion that is contrary to
the conclusion expressed in the medical opinion."  SSR 96-2p,

1996 WL 374188, at *3.  An opinion that is not entitled to

controlling weight may be entitled to some deference.  See id.

at *4.  The regulations provide the hearing officer with factors

to assist in his determination of how much weight or deference

to give the opinion of the treating physician,[5] and although it

is "desirable" for a hearing officer to analyze each of the

factors, the Court will not "remand [the] case so that another

hearing officer may arrive at the same decision with more

clarity."  Green v. Astrue, 588 F. Supp. 2d 147, 154 (D. Mass.

---

[5] The factors include: (1) whether the source actually
examined the complainant; (2) whether the source was a treating
physician; (3) the length of the treatment relationship and the
frequency of examinations; (4) the extent of the knowledge of
the treating source regarding the complainant's specific medical
ailments and conditions; (5) the amount of evidence provided by
the treating source to support his opinion; (6) the consistency
of the opinion with the record in its entirety and; (7) whether
the source is a specialist in the area on which he is giving an
opinion.  See 20 C.F.R. § 404.1527(c).
    The Social Security Administration promulgated this
regulation seeking to harmonize divergent views among the
circuits concerning the weight to be accorded to the opinion of
a treating physician.  See Guyton v. Apfel, 20 F. Supp. 2d 156,
167 n.14 (D. Mass. 1998) (citations omitted).  Nevertheless,
inconsistency persists.  See, e.g., id. (documenting courts'
misstatements of the "standard for evaluating the conclusions of
a treating physician" even after this regulation) (collecting
cases); Paul R. Verkuil & Jeffrey S. Lubbers, Alternative
Approaches to Judicial Review of Social Security Disability
Cases, 55 Admin. L. Rev. 731, 754-55 (2003) (noting widespread
perception of a "problem of inconsistent application of the law"
in the Social Security disability system); Jonah J. Horwitz,
Social Insecurity: A Modest Proposal for Remedying Federal
District Court Inconsistency in Social Security Cases, 34 Pace
L. Rev. 30, 37 (2014) ("[I]nconsistency, even if it can, at
times, lead to greater generosity, is the most serious problem
plaguing the [Social Security] system[.]").

1998); see Bourinot v. Colvin, 14-40016-TSH, 2015 WL 1456183, at
*10 (D. Mass. Mar. 30, 2015) (Hillman, J.) ("[T]he regulations
do not require a [hearing officer] to expressly state how each
factor was considered[.]").  The hearing officer is required,
however, to provide "good reasons" for deciding to give the
treating source's opinion the weight he did and must state
"specific reasons for the weight given to the treating source's
medical opinion . . . and must be sufficiently specific to make
[it] clear to any subsequent reviewers[.]"  SSR 96-2p, 1996 WL
374188, at *5; see also, e.g., Shields v. Astrue, 10-10234-JGD,
2011 WL 1233105, at *8 (D. Mass. Mar. 30, 2011) (Dein, M.J.)
("Because the [hearing officer] supported his rejection of the
treating physician's opinions with express references to
specific inconsistencies between the opinions and the record,
[his] decision not to grant [the treating physician's] opinions
significant probative weight was not improper.").

     The hearing officer's decision to give Dr. Gottschall's and
Dr. Crisostomo's opinions little weight was proper, as their
opinions are not supported by medical evidence and are
inconsistent with substantial evidence in the record; moreover,
the hearing officer sufficiently explained the specific reasons
governing his decision, Admin. R. 47.  Dr. Gottschall's
conclusion that Sanchez is unable to work due to pain and
mobility limitations stemming from his spine and shoulder issues

is not supported by the medical record, which shows that his

physical exams were routinely normal, see, e.g., Admin. R. 552,

718, 763.  The hearing officer noted that "objective findings"

demonstrate his ailments are under control, "including strength,

sensation, and gait."  Id. at 47.  Furthermore, Dr. Gottschall's

opinion that Sanchez can only lift and carry five pounds, sit

for four hours, and stand for two hours, is inconsistent with

the evidence in the record concerning Sanchez's activities and

capabilities.[6]  Though Dr. Gottschall averred that Sanchez's

---

[6] Sanchez claims that Johnson prohibits this Court from
considering his activities of daily living as substantial
evidence that is inconsistent with the opinion of his treating
physicians.  See Pl.'s Mem. 13 (relying on Johnson v. Astrue,
597 F.3d 409, 414 (1st Cir. 2010)).  In Johnson, the First
Circuit held that a hearing officer could not use evidence of
plaintiff's daily activities to support her decision to give the
treating physician's opinion no weight, because the physician's
opinion that plaintiff's fibromyalgia prevented her from sitting
for more than four hours at a time was not inconsistent with her
daily activities of driving short distances and performing light
housework.  See Johnson, 597 F.3d at 414.  Sanchez's argument
fails.
    First, Johnson does not promulgate the bright line rule
that daily activities cannot be considered when determining
whether an opinion is consistent with the record as a whole.  It
is a narrow holding confined to the specific facts of the case.
Moreover, a Social Security policy interpretation ruling
expressly states that a medical opinion is obviously
inconsistent where "a treating source's report contains an
opinion that the individual is significantly limited in the
ability to do work-related activities, but the opinion is
inconsistent with the statements of the individual[] . . . about
the individual's actual activities."  SSR 96-2p, 1996 WL 374188
at *3.  Second, Sanchez's situation is not analogous to Johnson;
here, Dr. Gottschall's opinion that Sanchez was precluded from
working is patently inconsistent with Sanchez's testimony about
being a drug runner, selling scrap metal, and riding and fixing

abilities are severely limited, Sanchez stated that he was in
fact able to do some housework and shopping, id. at 372-73,
drive, id. at 129, sell and run drugs, id. at 124, 133, sell
scrap metal, id. at 574, 734, and work on, and ride,
motorcycles, id. at 733, 735.  This conflicts with Dr.
Gottschall's opinion, and thus, the hearing officer was
justified in deciding to give it little weight, as it is
inconsistent with substantial evidence in the record.  See SSR
96-2P, 1996 WL 374188.

Similarly, Dr. Crisostomo's opinion that Sanchez's mental
issues seriously impair his ability to perform work-related
functions is not supported by objective medical evidence, and is
inconsistent with other substantial evidence in the record.
First, Dr. Crisostomo's statement that Sanchez's symptoms of
difficulty concentrating, anxiety, and panic attacks cause a
markedly limited ability to remember workplace procedure,
complete tasks, remember instructions, concentrate, and interact
with people, is inconsistent with Sanchez's GAF score of 60,[7]

_____

motorcycles.  Thus, Sanchez's argument that Johnson precludes
the consideration of evidence regarding his daily activities is
not persuasive.

   [7] Sanchez asserts that a GAF score does not directly bear on
whether an impairment is severe "under the disability
framework."  Pl.'s Mem. 14 (citing Revised Medical Criteria for
Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.
Reg. 50746 (Aug. 21, 2000) (to be codified at 20 C.F.R. pts. 404
and 416)).  Moreover, he emphasizes that the American

which indicates only moderate symptoms, Admin. R. 576. Similarly, the record contains psychiatric examination results that, for the most part, evinced only a moderate level of difficulties. See id. at 604, 619. Thus, the hearing officer was entitled to accord Dr. Crisostomo's opinion little weight, as it was not consistent with the medical evidence showing a high GAF score, and it conflicted with the evidence of Sanchez's

---

Psychiatric Association no longer uses the GAF score in its Diagnostic and Statistical Manual of Mental Disorders. Id. Thus, he argues that the hearing officer's reliance on it was improper. Id. The Social Security Administration stated in a memorandum, however, that it "will continue to receive and consider GAF scores just as it would other opinion evidence, but scores must have supporting evidence to be given significant weight." E.g., Bourinot, 2015 WL 1456183, at *13 (quoting and discussing memorandum); Lane v. Colvin, No. C13-5658 MJP, 2014 WL 1912065, at *9 (W.D. Wash. May 12, 2014) (same).

The SSA stressed that a GAF score cannot be used to "draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation." Bourinot, 2015 WL 1456183, at *14 (quoting Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D. R.I. 2014)). Thus, the hearing officer's consideration of Sanchez's GAF score is not improper, as Sanchez's testimony about his activities provided supporting evidence for a finding, consistent with a GAF score of 60, that he was only moderately impaired. See Admin. R. 49-50. Furthermore, the score was not used to draw any inferences from differences in scores assigned by various clinicians, nor was it taken in isolation, as Sanchez was assigned a score of 60 on two separate occasions, by the same physician, see id. at 576, 628 (stating Sanchez received a GAF score of 60 by Dr. Crisostomo after two different examinations). Thus the use of it was not improper. See Bourinot, 2015 WL 1456183, at *14 (holding that the hearing officer's consideration of plaintiff's GAF score was not improper where it was assigned by one physician on multiple occasions, and where the hearing officer also relied on other supporting evidence that showed plaintiff's ability to function despite her alleged impairments).

aforementioned activities such as drug running, and selling scrap metal.  Id. at 48.

The hearing officer acknowledged that Sanchez suffered pain and some limitations on his ability to work, and accounted for these limitations in determining Sanchez's residual functional capacity; he found, however, that Dr. Gottschall's opinion that these limitations completely precluded Sanchez from working were not supported by medical evidence, and were inconsistent with the record in its entirety.  Id. at 46.  Similarly, the hearing officer took into account Sanchez's "varying moods," and "limited [him] to no more than superficial social interaction," even though the evidence suggests that he suffers from "no more than moderate difficulties."  Id. at 48.  Finally, any argument that the hearing officer's decision was improper because he did not go through each factor provided in the regulations fails because his decision was supported by substantial evidence.  See Green, 588 F. Supp. 2d at 154 (internal citations omitted); see also Bourinot, 2015 WL 1456183, at *10.  The hearing officer's decision to give the opinion evidence little weight was proper, and this Court will not disturb it.

Sanchez also urges this Court to find that the hearing officer gave too much weight to the opinion of Witke, the impartial medical expert.  See Pl.'s Mem. 16.  This Court declines to do so.  First, "the amount of weight that can

27

properly be given the conclusions of . . . non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert." Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) (internal quotation marks and citations omitted).

Here, Witke was a member of the American Board of Psychiatry and Neurology, had expertise in the area of Sanchez's mental health issues, reviewed the record in its entirety, listened to all of Sanchez's testimony, and provided evidence to support her conclusion.  See Admin. R. 48.  These are proper factors for the hearing officer to consider.  See 20 C.F.R. § 404.1527(c).  Moreover, the hearing officer explained why he was affording significant weight to Witke's opinion, pointing to the specific evidence in the record that supports Witke's conclusions.[8]  See Admin. R. 49; see also SSR 96-2p, 1996 WL 374188 at *5.  The hearing officer gave Witke's opinion testimony more weight because it was consistent with, and supported by, the record.  The hearing officer's determination

---

[8] The hearing officer noted that though he had given Sanchez "the benefit of the doubt with moderate limitations in social functioning," Witke's opinion that Sanchez is capable of functioning at a higher level is supported by his high GAF scores and his own testimony about his activities.  Admin. R. 49.  The hearing officer also asserted that Witke's opinion that Sanchez's extended periods of depression stem from his issues with drug use was supported by his medical records and testimony showing a long history of substance abuse.  Id.

was proper and was based on substantial evidence.  This Court

will therefore not disturb it.  See Rodriguez v. Sec'y Health &

Human Servs., 893 F.2d 401, 403 (1st Cir. 1998) (finding that

the non-examining medical advisor's evaluation of "claimant's

residual functioning capacity" based on evaluations of the

claimant done by examining physicians can constitute

"substantial evidence" to support a finding); cf. SSR 96-6p,

1996 WL 374180, at *3 (July 2, 1996) ("[O]pinions from State

agency medical and psychological consultants and other program

physicians and psychologists may be entitled to greater weight

than the opinions of treating or examining sources.").

> **2.   Substantial Evidence Supports the Hearing
> Officer's Assessment of Sanchez's Credibility.**

Sanchez argues that the hearing officer erred when

assessing his subjective statements regarding the severity and

intensity of his symptoms, as the assessment, he claims, is not

supported by substantial evidence.  See Pl.'s Mem. 18.  At the

second step in determining Sanchez's residual functional

capacity, the hearing officer evaluates the evidence concerning

the intensity of said symptoms, and their effect on Sanchez's

ability to function.  See 20 C.F.R. § 404.1529(c)(1).  To do so,

the hearing officer considers statements made by the claimant

regarding his symptoms, but if there are any inconsistencies, or

the statements are not supported by the record, the hearing

officer must make a credibility determination to decide how much weight to give the claimant's testimony regarding his symptoms and their effects.  <u>Green</u>, 588 F. Supp. 2d at 156 (citing 20 C.F.R. § 404.1529(a)).  "The credibility determination by the [hearing officer], who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  <u>Frustaglia</u> v. <u>Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987).

Here, the hearing officer's credibility determination is supported by substantial evidence, and sufficiently explained in the notice of decision, and thus must stand.  First, the hearing officer noted that Sanchez's statements that his "pain and leg numbness cause totally disabling difficulty with lifting, overhead reaching, sitting, standing, walking, . . . as well as with performing personal care activities and daily tasks[,]" Admin. R. 46, were not supported by his medical record showing consistently normal test and physical examination results, <u>id.</u> at 46, 47.  He further observed that while Sanchez complains of breathing difficulties, his medical record shows that his asthma is well controlled and treated with medication, and does not present any ongoing complications.  <u>Id.</u> at 46.  The hearing officer also explained that Sanchez's subjective statements regarding the debilitating nature of his back and shoulder pain,

and his inability to reach or lift, conflicted with his
statements that he sold and ran drugs, sold scrap metal, and
worked on and rode motorcycles.  Id. at 47.

Regarding Sanchez's testimony about his mental health
symptoms, the hearing officer similarly explained that, though
Sanchez alleges he is markedly limited in his ability to
concentrate, interact with others, and complete tasks, the
record shows that he was repeatedly given a GAF score of 60,
indicating only moderate limitations.  Id. at 49.  Moreover, the
hearing officer found that Sanchez's activities "are social in
nature or require a considerable degree of concentration," thus
conflicting with Sanchez's claims of severe impairment.  Id.
Finally, the hearing officer stated that he declined to give
weight to Sanchez's subjective statements, because he made
several inconsistent statements regarding his ability to do
housework and to shop, and about his drug use.  Id. at 47-48.
Thus, because the hearing officer's credibility determination
was based on substantial evidence in the record that undermines
Sanchez's statements, and because he satisfactorily explained
his reasoning,[9] this Court will not overturn his determination.

---

[9] Sanchez also claims that because the hearing officer did
not explain why he found the testimony of Sanchez's roommate not
credible, the decision must be remanded.  Pl.'s Mem. 19.  "In
determining whether a claimant is disabled, a [hearing officer]
must consider lay witness testimony concerning a claimant's
ability to work."  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th

### 3. The Hearing Officer did not Err in Relying on the Testimony of the Vocational Expert.

Sanchez claims that the hearing officer erred in relying on the testimony of the vocational expert because the expert's determination that Sanchez could perform the jobs of a dining room attendant, kitchen helper, hand launderer, and marker conflicts with the job requirement as set forth in the Dictionary of Occupational Titles (the "DOT").  Pl.'s Mem. 19

---

Cir. 2009) (internal citation omitted).  Here, the hearing officer considered the testimony at issue, but did not explicitly delineate why he was rejecting it.  See Admin. R. 46. A hearing officer's "failure to give individual reasons for rejecting a lay witness's material testimony is [not] per se prejudicial[.]"  Molina v. Astrue, 674 F.3d 1104, 1118 (9th Cir. 2012); see Buckner v. Astrue, 646 F.3d 549, 560 (8th Cir. 2011) (declining to remand where claimant's girlfriend's testimony was not expressly addressed because it was merely cumulative of what the claimant already testified to).

Here, the hearing officer's discussion of Sanchez's roommate's testimony was very limited--noting she "testified to similar allegations [as those Sanchez testified to] regarding [Sanchez's] functioning, alleging that she basically takes care of him."  Admin. R. 46.  It is fair to infer that the officer discredited Sanchez's roommate's testimony for the same reasons he discredited Sanchez's: its inconsistency with his prior statements, see Admin. R. 46-47, and its discord with objective medical evidence, see id. at 48 (noting "the longitudinal objective medical evidence does not support that [Sanchez's] symptoms are of a totally disabling level or severity.").  This Court thus holds that even if the hearing officer's failure to explain why he was discrediting Sanchez's roommate's statements was error (and, to the extent he discredited the testimony because it failed to accord with objective medical evidence, it likely was error), any such error was effectively harmless, meaning "in a colloquial sense, that there was no harm from the [hearing officer's error] because there was an independent ground on which affirmance must be entered as a matter of law." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).

(citing Dictionary of Occupational Titles (4th ed. rev. 1991)). Specifically, he argues there is conflict between the vocational expert's statement that, with Sanchez's residual functioning capacity, he could perform these jobs, and the DOT's description of these jobs, which includes reaching.  Id. at 19-20; see DOT § 311.677-018, 1991 WL 672696 (describing dining room attendant occupation); id. § 318.687-010, 1991 WL 672755 (describing kitchen helper occupation); id. § 361.684-010, 1991 WL 672982 (describing hand launderer occupation); id. § 209.587-034, 1991 WL 671802 (describing marker occupation).

If there is a conflict between the testimony of the vocational expert and the DOT, the hearing officer must resolve the conflict and "provide[] a basis for relying on the [vocational expert's] testimony rather than on the DOT information."  Szumylo v. Astrue, 815 F. Supp. 2d 434, 440 (D. Mass. 2011) (Collings, M.J.) (quoting SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)).  This imperative only applies, however, when said conflicts "are apparent and have been identified."  Aho v. Comm'r of Soc. Sec. Admin., No. CIV.A. 10-40052-FDS, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011) (Saylor, J.) (internal citation omitted).

There was no identified, apparent conflict before the hearing officer.  The DOT descriptions at issue do not provide that any of these jobs require overhead reaching - they mention

reaching in general.[10]   On examination by Sanchez's attorney, the

vocational expert's testimony clarified that, at least with

respect to markers' reaching, such reaching is "typically . . .

done . . . at a level that does not require . . . reaching up,

[as] most of the time the items are labeled before [they] go[]

onto a shelf or that type of thing."  Admin. R. 189.  Thus the

ostensible conflict, at least with respect to markers, was

resolved.  Cf. Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir.

2003) ("Whereas the [DOT] describes jobs as they are generally

performed, an expert is often called upon to explain the

requirements of particular jobs, and as such, his deviations

from the [DOT] in such testimony do not actually 'conflict' with

the [DOT].").  Therefore reversal and remand on this ground is

inappropriate.[11]   See Massachi v. Astrue, 486 F.3d 1149, 1155,

---

[10] The jobs of dining room attendant (describing "Reaching:
Constantly - Exists 2/3 or more of the time"), kitchen helper
(same), and hand launderer ("Frequently - Exists from 1/3 to 2/3
of the time") may present a conflict, as the DOT states that
they require frequent reaching, the vocational expert testified
that in the case of a marker, he knows from his experience, as
he had seen the job of marker "done a lot," that it does not
require frequent overhead reaching.  Admin. R. 191.

[11] Any potential conflict as to the non-marker jobs, while
not resolved by the vocational expert at the hearing, was not
identified as such before the hearing officer, therefore this
Court will not vacate and remand on this ground.  See Aho, 2011
WL 3511518, at *14 (finding argument based on apparent
inconsistency between DOT and expert's testimony waived because
"there is no indication that this discrepancy was identified
during the hearing[]").

1155 n.19 (9th Cir. 2007) (describing hearing officer's failure to ask vocational expert about an apparent conflict with the DOT as a "procedural error"; stating such error would be "harmless" if either there was no actual conflict or the expert provided "sufficient support for her conclusion so as to justify any potential conflicts").

**V.    CONCLUSION**

For the aforementioned reasons, this Court GRANTS the Defendant's Motion to Affirm the Commissioner's Decision, ECF No. 20, and DENIES the Plaintiff's Motion for Judgment on the Pleadings, ECF No. 14.

**SO ORDERED**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE